The last case for today, 4-12-0-6-7-7, People v. Smith, for the appellant is Erin Griebel. Yes, Your Honor. Is that pronounced correctly? Yes. Okay. And for the appellate, Luke McNeil. Ms. Griebel, you may proceed. Your Honor, pardon me, but are we dividing the time for rebuttal? No. You'll get an automatic five minutes. You have 20 minutes to address us now, an automatic five, and rebuttal if you wish. Thank you. We are nothing but generous. That is generous. It is. Yes. May it please the Court. Counsel. Your Honors, my name is Erin Griebel. I appear on behalf of the appellant, Toussaint Smith. We raise three points for the Court's consideration today. The first is that the State failed to prove that the appellant, Mr. Smith, and his alleged co-conspirator, Ms. Layla Finley, also his girlfriend, actually entered into an agreement to traffic narcotics. Your Honors, I would point out that the State needed to, they needed Ms. Finley's testimony, it seems, they thought so at least, in order to prove this conspiracy. So her statements would have been admitted as part of the hearsay exception, the co-conspirator exception to the hearsay rule. But when we look through her testimony, we find that there's no design or scheme or shared interest, as precedent would direct us to find. And we also have, I believe, the State conflating some of the instances, when really they should be separated out. So we have Ms. Finley's March 15th excursion to St. Louis, where she sought cocaine from various people, all of whom were acquaintances of her own. She negotiated for price, amount, several times even, because she wasn't able to get what she originally had planned. So we have that day, March 15th. She actually never purchases the cocaine base in St. Louis, but actually purchases that in Hannibal, Illinois. Then we have four controlled buys conducted by the Adams County Sheriff and Task Force that were conducted with the use of a confidential informant, Mr. Tyler Douglas. So that's also in March of 2011, on the 2nd, the 14th, the 14th again, and on the 18th. And so it seems to me that what the State has done as it went about attempting to prove its case is that they sort of crowded all of these issues together, but the agreement at issue is actually March 15th alone. Between Mr. Douglas' testimony and Ms. Finley's, we have evidence put forward that the appellant sold cocaine or ecstasy and another substance after we got the lab report back that wasn't even a controlled substance from Mr. Douglas. And that happened on those four instances. But there was no allegation that Ms. Finley was part of an agreement for those sales to take place. So that was just the C.I. and the appellant. She was there, she more or less lived there, or however their domestic arrangement was, but she was there. But the only time that there was supposedly an agreement so that we can find the conspiracy would have been March 15th. So if we narrow just to those facts and we see the text messages from Ms. Finley's phone that are alleged to have been, there are screenshots that are alleged to be communications between her and the appellant who goes by Tyson, what we have is the appellant saying, what are you doing? Are you safe? Where are you now? Why are you waiting around? Why not just come home? She refuses. She persists. There's clearly no plan as to amount. No plan as to price. All of the other text messages with her various... Why is that necessary? Because the case law says that it's so. Because when it comes to a buying and selling narcotic transaction, that's not enough. Merely to engage in the purchase of narcotics is not enough to prove conspiracy. Now why is it necessary that there be discussion of the amount? Well, it's one of the things that we can look to, Your Honor, to determine whether or not there was an agreement. So any sort of prearrangement beyond mere knowledge of another person's criminal activity. And the Illinois case law is clear on that. And we have the Garth Court who cited not only, they're saying that where there's not proof of any prearrangement, prior discussions or plans made in preparation for the narcotics transaction, there's no proof that the defendant and the co-conspirator actually conspired. And so that is standard. Not simply mere knowledge. Not even mere presence. And so here, I mean, it's really not... I think one would be pressed to say that Ms. Finley was operating according to any sort of plan at all. I mean, it's really... She was scavenging. Well, what about... Douglas testifies the day before she goes. The defendant tells Douglas, Finley's going to Missouri tomorrow. She's going to bring back crack cocaine and I'm going to sell it. Oh, Your Honor, I think that that's not the exact quote. He says... I mean, there is an issue with that particular statement. It's the only one I identified where you would find a reference to direction or control by the appellant. What was the statement or what was the implication of the statement? That Tyler Douglas testified that Tyson said, I'm going to send Layla to St. Louis. Yeah. That. He didn't... Didn't say what she was going to do there? Well, she was going to purchase cocaine and the question, at least as I understood it, Your Honor, was do you want to put in money to purchase more? Is how I understood it. And if I'm not answering your question, please let me know, but it seems to me that that's the only instance in all of the testimony offered by Mr. Douglas wherein he's actually referencing some sort of direction or plan by the appellant. And I submit that it's colloquial reference and it's how folks talk to one another when they're boyfriend and girlfriend or husband and wife. I'm sending so-and-so to the store. It doesn't mean you're actually in charge of their actions or that it signifies anything more than knowledge that a person is going to set about some task. And I think that it's... It's really blown out of proportion, I think, conflated with these other sales where it ought not be. And we should look, what was the actual agreement and what was its object? And we know that the... That that has to... If we're talking about a conspiracy between Layla and the appellant, that must have been March 15th. And her actions just overwhelmingly show that she was directing herself. These are her friends and her acquaintances that she is contacting. She resists the appellant's suggestion that she comes home. She then arranges the sales somewhere else that there's no evidence that he knew anything about. There's no plan. There's no direction. There's no control. Counsel, at the very beginning of your argument, you indicated Finley ultimately purchased, made her purchase in Hannibal, Illinois. I presume you meant Hannibal, Missouri. Oh, I'm sorry. Okay, thanks. I do. Didn't Finley testify that she agreed to travel to St. Louis on the 15th to purchase crack cocaine for herself and defendant, Salim Quincy? Well, Your Honor, unless I'm mistaken, she... There were not statements as to reselling, and that's a very important fact, and I didn't glean that from the record. Well... I mean, is that really... She testified she traveled... She and the defendant agreed that she would travel to St. Louis to purchase crack cocaine. And you're disputing whether it was for the purpose of selling it to Quincy? Couldn't she testify to that? Well, Your Honor, I am disputing it. Because I think it changes the calculation, and if I understand your question, so there's a difference, right, between buying drugs and reselling them. Well, your position is she did not say that she went down to St. Louis to purchase crack cocaine for herself and defendant to Salim Quincy? I think that she may have referenced that, but I think that her testimony... I don't know what that means when you say she may have referenced it. I think it's an inference, Your Honor. She didn't explicitly say that? Not to my recollection. That he gave her $200 for that purpose? Yes, she did say that she was given $200, yes, I do recall that. But I think that it doesn't take it out of the main of merely arranging to purchase drugs, which is a standard below, then that is what is required to establish a conspiracy to traffic in narcotics. And so the difference... And I also think, too, that whatever her equivocation or word choice may be, what we know has happened is she has no... There's no plan that we can see her conforming to. There's no plan as to amount. Certainly, if the drugs are going to be resold, there would need to be some sort of amount to resell, because she's a user and she doesn't... She makes no qualms about that. And so when she ends up purchasing, whether she believes it to be for her use or whether there will be some left over for resale, I don't really know. But we have to have evidence that, in fact, there's some sort of pre-existing plan. And there's... I think there's no way to draw a fair inference from her testimony and her text messages that she was conforming to any plan at all, her own or anyone else's. I mean, it's a haphazard exercise that she engages in. And as much as Mr. Douglas believed that the appellant was sending Layla to St. Louis to buy cocaine, it doesn't sound like much of an agreement to me, Your Honors, where, in fact, she never does purchase it. And she ends up finding some friend in Hannibal that she purchases from instead, just sort of on the fly, as she scrolls through her various connections. And I would contrast that with Duckworth, for example, where we have the co-conspirator, Tammy Duckworth, who's selling to an undercover agent. They meet to make the deal. She says, my uncle is actually the source and I can't give you... I won't be able to get the drugs for you unless he sees the money first. The undercover agent says, well, no, I'd like to see the drugs. She says, hang on. She goes to a van, gets drugs. The inference is that that is her uncle, that he is the source, and that he is in the van because she comes back with drugs. And the court held there that his mere presence at the scene was not sufficient to establish conspiracy for the sale of controlled substances. What we have here is Tyson's presence by text message where he tells her to give up and go home and has to ask her what she's doing several times just because the plan, whatever that may be, is something that she's making up as she goes. And so I submit to you that there's no evidence of an agreement. I couldn't tell you what they would have agreed on because it certainly changed as she went along. If there are no further questions on that plan, I'd like to speak to you for just a second. Thank you, Your Honors. I just wanted to point out that when Agent Brown was recalled, it was sort of under the guise of rebuttal testimony. Why do you say rebuttal? The state hadn't yet rested. He was dismissed, Your Honor. Yes, but why isn't that to recall him still in the state's case? He wasn't rebutting anything, no one had testified for the defense. Well, and I suppose that's my point, Your Honor, is that it wouldn't have been admissible as rebuttal evidence, and there's no rule that I can find that says that if the state didn't get what it's wanted before it excused its witness, that it can just try some more. And that's the objection that I raise to that. Isn't it a matter left to the trial judge's discretion as to whether or not to permit this? I think so, Your Honor. I think that's true and that's the standard. Why did the trial court abuse its discretion in this case by doing so? Our position on that, Your Honor, is that when we sort of balance it with the prejudice of that decision, that, in fact, Mr. Smith was deprived of the opportunity to expose those errors because the state got to try again. And that, in fact, they should have waited their turn, and that cross-examination could have gone forward. And that the impact of the testimony was altered and undermined by the fact that the state got to revisit its case over the defense objection. And third, Your Honors, we raise a claim of vindictive prosecution, which is something that I certainly don't take lightly, but it does seem to me to fit in this case. The controlled sales were alleged just prior to, it was a previous case, it was 11 CF 156, and that was dismissed with prejudice on August 16th of 11. Certainly the state was not happy with that, and these are the substantive offenses, Your Honor, for the sales. So they had a motion to reconsider. It was denied after a hearing on the motion. Then the state comes back 17 days later with an indictment for conspiracy as to those same acts. There is no dispute in the record that the factual basis for the conspiracy is in any way different than those substantive offenses that Judge Roseberry had dismissed with prejudice. None at all. And so what happened, though, at the trial court was that counsel approached the issue from a stance of the double jeopardy concerns. And it seems to me that perhaps the court was given the answer to the wrong question. What's happened instead is because the state was stymied and the cause that included the substantive offenses was dismissed with prejudice, I might add, and I do, because of a Brady violation, a discovery violation, that the state decided they would come around through the back door with a trump card and instead reissue the charges but as a conspiracy, which certainly they can do because the rule in Blockburger does not prevent them from doing so. But what they have done is then punish the appellant for exercising statutory and constitutional rights. They've also managed to sidestep the ramifications of a discovery violation, which is, I think, a bit galling, actually, that the trial court sought to sanction the state with a dismissal with prejudice. And so they come right around and reissue the charges of conspiracy. And for that, according to the case law, it would seem that because of the timing, 17 days later, and because there are no distinct facts at all and it's not disputed, that in fact that entitles the appellant to a presumption of indicative prosecution. And I would note that it's not unlike if the appellant had been acquitted because those were the follow-on judge for this cause. Judge Walden had said that the dismissal of the prior charges, which are now the underlying acts, were, for all intents and purposes, the dismissal of 11 CF 156 has no difference in tenor than if the smith had been tried and found not guilty. And that's in the record of page 146. And then the state agreed. And so what we have is really a prosecution that uses an in quo defense as a trump card, where it can get out of the penalty for discovery violation and then bring a prosecution anyway. And it seems to undermine the credibility of their office, but also to sidestep the authority of the court. The defendant didn't make a motion at trial level challenging any of this? There were motions, Your Honor, back and forth in hearings. On the basis of a vindictive prosecution? No, Your Honor, it was on the basis of double jeopardy. What I'm talking about, once the new charges are filed, that was it. The argument you're now presenting was never presented, which is why we have no record on it. Well, Your Honor, in fact, the trial counsel for appellant failed utterly to file any sort of post-trial motion whatsoever, and his employment with the Office of the Public Defenders was terminated shortly thereafter. Which is why I asked the court repeatedly to use its discretion to examine these claims. Of course, apparently it was successful, and apparently a rare matter of getting a case dismissed for prosecutorial violations and discovery. Is that what happened initially? I'm sorry, Your Honor, I didn't hear the first part. You pointed out that the state's charges were originally dismissed. With prejudice, yes, Your Honor. With prejudice. That's extraordinarily rare, counsel. So counsel must not have been too ineffective if he was somehow able to achieve that goal. It was different counsel, Your Honor. So different attorney, and then we had someone else involved? Certainly, yes. I think there were three different attorneys at the trial level. And I think it's just because it's so extraordinary that the state should not be allowed to just get around it by then recharging it as a conspiracy. Thank you, Your Honors. Okay, thank you, Mr. McNeil.  Counsel. As for the sufficiency of the evidence argument, Finley did testify to an agreement with defendant. She testified that she was going to St. Louis for the purposes of buying drugs, coming back, and selling them with defendant. She also testified clearly that defendant provided the money for this, and then this testimony was corroborated by text messages. The main text message that corroborates this is between the defendant and her. Finley texted defendant that she was nervous because she was waiting too long to meet someone in St. Louis. Defendant suggested she did leave, that's correct, as counsel pointed out. That was directly followed by a text from defendant saying, we can't afford to get jacked. Not you can't afford to get jacked, but we. This showed that at least it was a reasonable inference for the jury to make that defendant. Counsel, those texts certainly, in light most favorable to the state, given our standard review here, indicate that there was an agreement that drugs would be purchased, but not that drugs would be purchased, brought across state lines, and then sold. And the amount of money apparently involved was more consistent with the user amount than a dealer amount. So what does the state have with regard to the trafficking, to bringing it back into the state for purposes of manufacture to deliver versus personal use? I'm pretty sure early on in Finley's testimony, I think the state asked her a question that she answered affirmatively about bringing the drugs back. I think you're correct. Is there anything that the state has other than her statement that the agreement to purchase was for resale, not just for personal use? I think a reasonable inference could be made from Douglas' testimony in that regard. He was asked by the defendant if he wanted to go in on this too. It could obviously mean a business venture. But yes, and you mentioned the standard of review here, the sufficiency of evidence argument. So at that point, obviously, the main contention here is whether there was an agreement between defendant and Finley. An act or acts were obviously done in furtherance of the conspiracy as soon as she left for St. Louis and was seeking out the drugs. And the state submits that a reasonable inference could be made from Finley's testimony and the corroborating text messages that there was an agreement between those two, obviously to buy cocaine in St. Louis and bring it back to Illinois. Which was the charge this time was for conspiracy to control substance trafficking. As for the recalling Agent Brown, the defendant concedes that this issue was forfeited. And there was no error here, so obviously there should be no plain error analysis. It is the court's discretion on whether to call, and this was still during their case in chief. The defendant cites many cases involving rules for rebuttal witness, but this was not a rebuttal witness. This was during the state's case in chief. People v. Clark, a 2nd District case, at least outlines... Even if it was considered rebuttal evidence, doesn't the court have some discretion in allowing that as well? Of course. But, I mean, just offhand, the three suggestions that this Clark case, which I also cited, the state cited in its brief. The testimony can't contradict the witness's earlier testimony. The defendant has ample opportunity to cross-examine the witness. And the defendant's not presented from preparing his case to counter this additional testimony. Here, this additional testimony was consistent with his original testimony. It is actually clarifying his original testimony, so it didn't contradict his earlier testimony. The defendant had an opportunity to cross-examine the witness after recall testimony, but failed to do so. Although, counsel did ask the agent Brown a few questions during cross-examination on his original testimony regarding this confusion during the chain of custody, which refutes any argument that the defendant was somehow not allowed to bring this up. Any inconsistencies that there were between the two testimonies could obviously have been brought up by defense counsel, and in a certain way was during the original cross-examination. And finally, this was during the state's case in chief, so obviously, although the testimony was consistent, which I don't see how it would have changed defense theory at all, they had ample opportunity to prepare based on this additional testimony. The final argument was the vindictive prosecution. Again, the defendant concedes this issue is forfeited. There was no evidence whatsoever of any vindictive prosecution here, so obviously, plain error analysis shouldn't be applied. This court in People v. Hall stated a prosecutor's discretion to charge as broad, and in some circumstances, the prosecutor may file additional or harsher charges against the defendant. In general terms, prosecution is vindictive and violates due process if undertaken to punish a person because he has done what the law plainly allows him to do. Hall also outlines the requirements for a presumption of vindictiveness. Those requirements are presumptions warranted when the prosecutor brings additional charges and more serious charges against the defendant after the defendant has been convicted of an offense and has overturned his conviction. Here, the defendant wasn't convicted on his original charges of delivery of controlled substance. The charges were dismissed based on discovery violations before any trial. Also, the charges aren't more serious. His original charges for delivery of controlled substance were one Class X felony, three Class II felonies, a Class III, and a misdemeanor. The present charge was a single Class I. He was eligible for Class X sentencing based on prior convictions, but at any rate, these charges aren't any more serious than the original, and they're obviously less in the amount of charges than the original charges. So both of the Hall requirements for a presumption of prosecutorial vindictiveness fail here. And finally, forfeiture is especially important in this case. The state did offer zero facts to overcome any sort of presumption of prosecutorial vindictiveness, but that's because the defendant never alleged this at all at any proceeding before this appeal. The state couldn't be expected to provide facts for an argument the defendant didn't make. And this circumstance is a perfect example of why forfeiture rules are needed, which are explained and outlined by Justice Steigman in People v. Rathbone and cited in the state's brief. If there are no more questions. Seeing none, thank you, Mr. McNeil. Ms. Griebel, any rebuttal? Go ahead. Thank you, Your Honors. First, with regard to the forfeiture, the state cites People v. Enoch. The posture of that case is post-conviction relief. It's not a direct appeal, so the question at issue is primarily an effective assistance of counsel. It's also a death penalty case, and it does not mention Rule 615, which is the rule which I have asked the court to use its discretion to review these claims. So I would submit that the state's forfeiture argument is completely not on point. With regard to Ms. Finley, Your Honors, her text messages are revealing of her intentions, but not of an agreement. She says that she's going looking for the drugs that I want, that she explains that when she was asked, you know, what are you doing, she said, quote, sorry, he was, quote, asking me if I'm looking for the cocaine I want to purchase. Those are her words. She wanted it. Now, she makes one reference that, oh, I'll bring it back, and along with, you know, Tucson, I'll sell it and make some money. There's no pronoun, actually. I don't know if she's reselling it. I would note that this would be her third felony drug conviction, though, Your Honors, so it's certainly not beyond her capability. And if we look at the savvy with which she conducts these text messages, she is the one negotiating various prices between different grams, aces, quarters of cocaine. And I don't think that you can leap, or that the jurors could have fairly leapt to an inference that there was an agreement to resell cocaine, because two of these buys, well, they weren't cocaine. We have ecstasy. We have some other powder that we needed the lab to identify. And then we have a sale of cocaine base. I'm sorry, a sale of powder, where she was after cocaine base that day, or crack, as it's commonly called. So where the inference is that they have a prearranged plan for her to scavenge and then resell cocaine, I do not know. And if we then don't allow the state to sort of broaden the scope into these other sales, and we look just to March 15th, we have evidence of some of her scattered thoughts. But what we don't have is evidence that there was an agreement to resell, because we don't know at what price or even how much. I don't know how you can plan to resell something if you don't know if you're getting it, from where, how much, or any of those factors or others. And I just wanted to add that on the record on page 514, Your Honor, that addresses the statement of Mr. Douglas that you referenced to me earlier in regards to sending Layla to St. Louis to purchase cocaine. And he does not mention resale in that statement. There's nothing more here than the appellant simply being a boyfriend. He's aware. He knows what she does. He checks on her. But to take that concern, even the statement as to we can't get jacked, there's no reason to think it's not a reference to household income, because if she loses money, where is she supposed to get money to meet those needs? Well, likely from him, because that's how couples do things. So certainly I can't afford for a partner to lose all of their money if I don't have anything to then shore up our bottom line for necessities and others. And I thank the Court for its attention. Okay. Thank you, Counsel. We'll take this matter into advisement, being recessed until September 25th.